**2024-1433, -1434, -1437, -1438, -1439, -1440, -1442**

# United States Court of Appeals for the Federal Circuit

---

NEW YORK UNIVERSITY,

*Appellant,*

*v.*

RESMED, INC.

*Appellee.*

---

APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NOS. IPR2022-00988, IPR2022-00989, IPR2022-00990, IPR2022-00991, IPR2022-00992, IPR2022-00993, IPR2022-00994

---

## RESPONSE BRIEF OF APPELLEE RESMED, INC.

---

Lisa K. Nguyen
Eric E. Lancaster
**PAUL HASTINGS LLP**
1117 S. California Avenue
Palo Alto, CA 94304
lisanguyen@paulhastings.com
ericlancaster@paulhastings.com
Telephone: (650) 320-1800

Grace Wang
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
gracewang@paulhastings.com
Telephone: (213) 318-6000

David M. Tennant
Alan M. Billharz
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, D.C. 20036
davidtennant@paulhastings.com
alanbillharz@paulhastings.com
Telephone: (202) 551-1700

Kamilah Alexander
**PAUL HASTINGS LLP**
4655 Executive Dr., Suite 350
San Diego, CA 92121
kamilahalexander@paulhastings.com
Telephone: (858) 458-3000

*Counsel for Appellee ResMed, Inc.*

**FORM 9. Certificate of Interest**                                    Form 9 (p. 1)
                                                                        March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1433, -1434, -1437, -1438, -1439, -1440, -1442 |
| **Short Case Caption** | New York University v. ResMed, Inc. |
| **Filing Party/Entity** | ResMed, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/26/2024          Signature:  /s/ Lisa K. Nguyen

                          Name:       Lisa K. Nguyen

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| ResMed, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Allen & Overy LLP: Sara Townsend | Allen & Overy LLP: David A. Hubbard (no longer with firm) | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF RELATED CASES ................................................... vii

STATEMENT OF THE ISSUES ......................................................... viii

I.      INTRODUCTION ........................................................................1

II.     STATEMENT OF THE CASE ......................................................2

      A.      Technology Background ..................................................4

           1.      PAP Machines .......................................................4

           2.      Analyzing Breathing Patterns ...............................6

      B.      Challenged Patents .........................................................8

           1.      The Claimed Inventions .......................................8

           2.      Prosecution History ............................................10

           3.      Claims on Appeal ...............................................11

      C.      Prior Art at Issue ..........................................................11

           1.      Sullivan995 .........................................................12

           2.      Sullivan460 .........................................................13

           3.      Matthews ............................................................14

      D.      Proceedings Below .......................................................15

           1.      IPR Proceedings .................................................15

           2.      Final Written Decisions ......................................16

III.     SUMMARY OF THE ARGUMENT ..........................................18

IV.     ARGUMENT ............................................................................19

      A.      Standards of Review .....................................................19

      B.      The Board Properly Construed the Claims ..................21

           1.      The Board Correctly Adopted the Plain and Ordinary Meaning of "Analyzing the Breathing Patterns" ....................23

           2.      The Board Properly Considered and Correctly Rejected NYU's Erroneous Narrowing Construction ............................28

           3.      NYU's Criticisms of the Board's Analysis are Unavailing.....40

C.    The Board's Obviousness Determinations are Correct and Supported by Substantial Evidence ................................................... 48

    1.    NYU's Enablement Challenge to Sullivan460 is Contrary to Law ..................................................................................... 48

    2.    The Board Properly Rejected NYU's Argument That Sullivan460 is Not Enabled ..................................................... 50

    3.    Substantial Evidence Supports the Board's Finding That Sullivan460 Teaches Determining Asleep/Awake States ........ 53

    4.    NYU's Argument That the Prior Art Does Not Disclose Obstructions is Contrary to Substantial Evidence .................. 57

    5.    Substantial Evidence Supports the Board's Findings That the Asserted Combination Discloses Troubled Wakefulness ................................................................................ 59

    6.    NYU's Challenge to Motivation to Combine and Reasonable Expectation of Success Repeats Its Flawed Arguments ................................................................................ 60

D.    The Board Complied with the Administrative Procedure Act ........... 62

V.    CONCLUSION AND RELIEF SOUGHT ................................................. 64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*In re Abbott Diabetes Care, Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ...........................................37, 38, 40

*Alacritech, Inc. v. Intel Corp.*,
   966 F.3d 1367 (Fed. Cir. 2020) ........................................................63

*Alcon Research, Ltd. v. Apotex Inc.*,
   687 F.3d 1362 (Fed. Cir. 2012) ........................................................34

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ...................................................49, 50

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ........................................................28

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ........................................................54

*Ariosa Diagnostics v. Verinata Health, Inc.*,
   805 F.3d 1359 (Fed. Cir. 2015) ........................................................20

*AstraZeneca AB v. Mut. Pharm. Co., Inc.*,
   384 F.3d 1333 (Fed. Cir. 2004) ...................................................35, 36

*Baxalta Inc. v. Genentech, Inc.*,
   972 F.3d 1341 (Fed. Cir. 2020) ...................................................25, 28

*Becton, Dickinson & Co. v. Baxter Corp. Englewood*,
   998 F.3d 1337 (Fed. Cir. 2021) ........................................................20

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ...................................................37, 38

*Bradium Techs. LLC v. Iancu*,
   923 F.3d 1032 (Fed. Cir. 2019) ........................................................35

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ........................................................23

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ..............................................22, 29, 30

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) ...........................................................44

*Epistar Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1321 (Fed. Cir. 2009) ...........................................................23

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
   766 F.3d 1338 (Fed. Cir. 2014) ....................................................43, 44

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ...........................................................35

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
   78 F.3d 1575 (Fed. Cir. 1996) .............................................................44

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021) .............................................................42

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ...........................................................47

*K/S Himpp v. Hear-Wear Techs., LLC*,
   751 F.3d 1362 (Fed. Cir. 2014) ...........................................................20

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) .............................................................20

*Laitram, LLC v. Ashworth Bros., Inc.*,
   2023 U.S. App. LEXIS 11789 (Fed. Cir. May 15, 2023)....................47

*Liebel-Flarsheim v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .............................................................28

*Littlefuse, Inc. v. Mersen USA EP Corp.*,
   29 F.4th 1376 (Fed. Cir. 2022) ...........................................................33

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc) ......................................29, 46

iv

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
  70 F.4th 1331 (Fed. Cir. 2023) ........................................52, 56

*Mitsubishi Heavy Indus., Ltd. v. United States*,
  275 F.3d 1056 (Fed. Cir. 2001) ....................................................20

*In re Morsa*,
  713 F.3d 104 (Fed. Cir. 2013) .....................................................49

*In re NuVasive, Inc.*,
  842 F.3d 1376 (Fed. Cir. 2016) ...............................................21, 62

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ...................................................48

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .............................................*passim*

*Provisur Techs., Inc. v. Weber, Inc.*,
  50 F.4th 117 (Fed. Cir. 2022) .....................................................62

*Regents of the Univ. of Minn. v. Gilead Scis., Inc.*,
  61 F.4th 1350 (Fed. Cir. 2023) ...................................................46

*ScriptPro LLC v. Innovation Assoc., Inc.*
  ˌ833 F.3d 1336, 1341 (Fed. Cir. 2016) ........................................32

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
  8 F.4th 1285 (Fed. Cir. 2021) .....................................................19

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ....................................................29

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
  806 F.3d 1356 (Fed. Cir. 2015) ...................................................35

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ....................................................31

*Surgalign Spine Tech., Inc. v. LifeNet Health*,
  2022 U.S. App. LEXIS 9592 (Fed. Cir. April 11, 2022).................48

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ............................................................31

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ............................................................21

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) .........................................36, 37, 39, 40

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017) ............................................................52

*Vitronics Corp. v. Conceptronic*,
   90 F.3d 1576 (Fed. Cir. 1996) .......................................................35, 44

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999) ..............................................................47

*White v. Dunbar*,
   119 U.S. 47 (1886) ................................................................................22

*Yorkey v. Diab*,
   601 F.3d 1279 (Fed. Cir. 2010) .....................................................40, 46

**Statutes**

5 U.S.C. § 706(2)(A), (E) ...........................................................................20

35 U.S.C. § 102 ..........................................................................................49

35 U.S.C. § 103 ..........................................................................................49

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel for Appellee ResMed, Inc. ("ResMed") states that no other appeal in or from the same proceedings before the United States Patent and Trademark Office was previously before this or any other appellate court.

Pursuant to Fed. Cir. R. 47.5(b), the decision in this appeal may affect the following case:  *New York University v. ResMed Inc.*, No. 1:21-cv-00813-JPM (D. Del.).  That case is stayed pending the outcome of the *inter partes* review ("IPR") proceedings that are subject of these appeals.

## STATEMENT OF THE ISSUES

1.      Whether the Board correctly declined to adopt NYU's proposed narrowing construction for "analyzing the breathing patterns" over its plain and ordinary meaning.

2.      Whether the Board correctly determined that certain challenged claims are unpatentable as obvious over Sullivan995 in view of Sullivan460, where substantial evidence supports the Board's findings regarding the disclosures of the prior art.

3.      Whether the Board correctly determined that certain challenged claims are unpatentable as obvious over Sullivan995 in view of Sullivan460 and Matthews, where substantial evidence supports the Board's additional findings regarding the disclosures of Matthews.

4.      Whether the Board complied with the Administrative Procedure Act in reaching its determinations regarding claim construction and obviousness.

## I.    <u>INTRODUCTION</u>

The Board's final written decisions should be affirmed.  The Board performed a thorough analysis and correctly determined that the challenged claims would have been obvious in view of the teachings of the asserted prior art.  NYU fails to identify any error in the Board's decisions, much less a reversible one.

Central to this appeal, the Board correctly declined to adopt NYU's narrowing construction of the "analyzing the breathing patterns" terms.  NYU sought to replace the plain and ordinary meaning of these simple terms with a confusing 36-word construction based on "implied lexicography."  NYU then sought to further construe its construction to require analysis of both amplitude and temporal structures—terms that appear nowhere in the intrinsic evidence.  NYU's double construction would have effectively and improperly rewritten the claims after issuance.  This Court should similarly decline NYU's invitation to deviate from the plain and ordinary meaning.

Beyond claim construction, NYU asserts a multitude of meritless factual challenges.  But the Board more than adequately addressed NYU's arguments in the proceedings below, and the Board's factual determinations regarding the disclosures of the asserted prior art are supported by substantial evidence.  And NYU's pro forma APA challenge is merely a repeat of the meritless arguments above.  This Court should affirm.

1

## II.    <u>STATEMENT OF THE CASE</u>

In 1981, Professor Colin Sullivan and his colleagues at the University of Sydney developed the first positive airway pressure (PAP) device to address sleep disordered breathing.  These PAP machines improve sleep quality for patients with snoring or other sleep disordered breathing by applying air pressure to keep a patient's airway open.  Patients, however, often struggle to use PAP systems because of the discomfort caused by, amongst other things, the high pressure while awake.  The Challenged Patents address this problem by decreasing pressure when the patient is awake and increasing pressure when the patient is asleep.  But this feature was by no means inventive in August 2003—the claimed priority date for the Challenged Patents.

By 2003, Professor Sullivan and his colleagues had already published numerous references disclosing this feature.  Notably, Sullivan460 discloses a PAP system with "a first mode for use when the patient is awake, and a second mode for use when the patient is asleep."  Appx8959 (6:30-32).  When the patient is awake, "the treatment means provides a minimally intrusive air and pressure delivery to the patient, and hence is more comfortable."  *Id.* (6:32-34).  When the patient is asleep, "the treatment means provides a relatively greater air and pressure delivery to the patient than in the first mode, which is sufficient to treat [sleep disordered breathing]."  *Id.* (6:34-7:2).  Based on this and other substantial evidence, the Board

correctly determined that Sullivan460 discloses this feature.  Appx47-51; Appx128-30; Appx197-201; Appx275-83; Appx360-67; Appx442-50; Appx517-24.

With the inventive concept of the Challenged Patents plainly disclosed by Sullivan460, NYU engineered a claim construction in a transparent attempt to exclude the prior art.  But NYU's double construction (which improperly injects a temporal analysis requirement found nowhere in the intrinsic evidence) runs afoul of almost every basic claim construction principle, including improper exclusion of numerous claimed embodiments disclosed in the Challenged Patents.  In particular, the specifications disclose, and the dependent claims recite, that the claimed "analyzing the breathing patterns" encompasses analyzing airflow rate.  *See, e.g.,* Appx594 (3:55-61) (flow sensors detect "rate of airflow"), Appx611 (cl. 3) ("the hardware processor determines the breathing patterns using the measured airflow rate"), Appx677 (cl. 8) ("the breathing patterns that are indicative of [REM sleep] comprise…a low flow rate").  When the patient has a low airflow rate, this breathing pattern is indicative of sleep.  Appx595 (6:53-57) ("when the breathing pattern includes … a high respiratory rate and a low flow rate … the processing arrangement 24 may identify the breathing pattern as the REM sleep state").  Critically, this is very same breathing pattern analysis undisputedly disclosed by Sullivan460.

Among several embodiments, Sullivan460 discloses "a sleep sensor which senses whether or not the patient is asleep" by determining "when there is a reduced

3

average airflow in the patient's upper airway." Appx8960 (7:3-7, 7:10-12, 7:17-19). Sullivan460 explains that "a switching means responds to the sleep sensor and automatically switches the treatment means between [the] two modes of air delivery," applying lower pressure for the "first mode for use when the patient is awake." Appx8959-60 (7:5-7, 6:31). Based on this and other substantial evidence, the Board correctly determined that the asserted prior art discloses the "analyzing the breathing patterns" limitation. Appx45-51; Appx128-30; Appx197-201; Appx275-83; Appx360-67; Appx442-50; Appx517-24.

The Board's decisions should be affirmed.

## A.    Technology Background

### 1.    PAP Machines

Obstructive sleep apnea syndrome (OSAS) "is a well recognized disorder … characterized by an intermittent obstruction of [a patient's] upper airway occurring during sleep." Appx593 (1:7-1:16). "The obstruction results in a spectrum of respiratory disturbances ranging from the total absence of airflow (apnea) to significant obstruction with or without reduced airflow (hypopnea and snoring)." *Id.* (1:16-1:20). Because such respiratory disturbances result in decreased blood oxygenation, they "are recognized [] causes of sleep disruption and risk factor in certain heart disease." Appx9121 (1:27-1:28, 1:43-14:8).

PAP therapy has been "the mainstay of treatment" since Dr. Sullivan and his colleagues first applied it to treat OSAS in 1981.  Appx593 (2:1-2:8), Appx9121.  "[T]he upper airway during sleep mimics the behavior of a collapsible tube."  Appx9136.  To prevent collapse, positive airway pressure opposes the force created during inspiration (i.e., inhalation) and the gravitational effects on the tongue during expiration (i.e., exhalation).  Appx9136, Appx7969-72.

Typically after clinical observation, a physician would prescribe a therapeutic pressure for a patient and PAP machine for home use.  But as therapy research developed, the industry began examining approaches that employed variable pressure.  Appx9096, Appx7972.  By 1993, Dr. Sullivan and his colleagues had developed an auto-adjusting continuous positive airway pressure (CPAP) machine that "adjusts CPAP pressure on a minute-by-minute basis according to the degree of upper airway obstruction."  Appx7972.  Indeed, Dr. Rapoport, the first named inventor of the Challenged Patents, was familiar with Dr. Sullivan's work, and acknowledged that Dr. Sullivan and his colleagues were "ahead of the rest of us."  Appx9098.  Importantly, these self-adjusting CPAP machines would typically provide "minimal awake pressure."  Appx9096.

"The major limitation of CPAP therapy relates to discomfort or other factors leading to incomplete compliance with the necessary use of the device."  Appx9136-43.  By the mid-1990s, it was well-recognized that lowering the pressure when the

5

patient is awake could increase compliance. Appx9099 ("lower pressure … will be more comfortable for the patient, particularly when they are awake, which may result in a higher compliance and better CPAP therapy than may results from a very high pressure"); Appx7972-74.

Consequently, auto-adjusting PAP machines became common, particularly those that "while the subject is awake…automatically adjust the degree of assistance to maintain at least a specified minimum ventilation." Appx9152.

## 2.    Analyzing Breathing Patterns

For decades, breathing patterns have been analyzed to indicate the sleep-wake states of patients. Appx9332; Appx9342. Specifically, breathing patterns can indicate additional states within sleep and wake. In sleep, for example, "overall tidal volume and respiratory rate are stable in non-REM sleep but are characteristically irregular in REM sleep." Appx9302. And while irregular breathing in sleep indicates REM sleep, irregular breathing in wake indicates nocturnal panic, or what the Challenged Patents termed "troubled wakefulness."[1] In nocturnal panic, an individual "wak[es] from sleep in a state of panic," typically accompanied by "breathing irregularities." Appx9346, Appx9355.

---

[1] The Board adopted the undisputed construction of "troubled wakefulness" to mean "a state in which the breathing pattern is irregular, indicating that the patient is both awake and either anxious or uncomfortable." *E.g.*, Appx15.

These sleep-wake states impact the appropriate pressure to be applied. For example, "postural muscle tone is highest in wakefulness, decreased in non-REM sleep, and minimal or absent in REM sleep." Appx9299. Thus, as the patient transitions from wake to sleep and deeper states of sleep, the patient's muscles relax. Appx9302. This results in a narrowing of the individuals' upper airway and a higher potential for respiratory obstruction. Appx9302.

By 2003, auto-adjusting CPAP systems were available on the market that included a processing unit that could detect breathing patterns and adjust pressure based on those breathing patterns. Appx9616, Appx9649. These systems recognized that "[i]nsufficient pressure results in ineffective therapy while too much pressure can lead to discomfort, non-compliance, and pressure-related side effects." Appx9472. Analyzing the breathing patterns allowed these systems to adjust pressure as needed. *Id.*

These auto-adjusting CPAP systems could also address sleep-wake states that were accompanied by irregular breathing. For example, Matthews recognized that "[w]hen a patient is awake, in REM sleep, or in distress, breathing tends to be more erratic." Appx9011 (21:34-21:38). In such event, Matthews taught to "interrupt the auto-CPAP controller if the patient's breathing pattern becomes too variable." Appx9011 (21:39-21:41), Appx9012 (23:67-24:2).

### B.    Challenged Patents

#### 1.    The Claimed Inventions

The Challenged Patents describe well-known systems and methods for treating OSAS with CPAP therapy.  Appx585; Appx587; Appx593-94 (2:60-3:18).  Indeed, in describing an embodiment of "the present invention" in Figure 1 (reproduced below), the Challenged Patents explain that the system uses conventional components that operate in conventional ways.



FIG. 1

A patient "receive[s] airflow having a particular pressure from a flow generator 22" where the amount of pressure is determined with "any conventional PAP therapy methods."  Appx594 (3:48-3:54).  "Conventional flow sensors 23 [] detect the rate of airflow to/from patent [*sic*]," and send signals to the processing

arrangement 24, which "outputs a signal to a conventional flow control device 25" to control the pressure. *Id.* (3:55-3:64).

The Challenged Patents, however, note that "PAP therapy has not taken sleep/wake state into account, and conventional PAP systems apply pressure unnecessarily when the patient is awake." Appx593 (2:13-2:15). Consequently, "patients often report discomfort due to high pressure while being awake." *Id.* (2:27-2:28). To remedy this problem, the Challenged Patents disclose that "the applied pressure should be provided only when the patient is asleep." *Id.* (2:29-2:30). Figure 10 (reproduced below) illustrates this allegedly inventive feature of the Challenged Patents. Appx590.



F I G. 10

There is no discussion of analysis of amplitude or temporal structure of a waveform in the Challenged Patents. Indeed, the terms "amplitude" and "temporal" do not appear in the Challenged Patents at all.

### 2.    Prosecution History

During the prosecution of the Challenged Patents, NYU did not challenge the disclosure of the "analyzing the breathing patterns" limitation by the prior art. Nor did NYU narrow the scope of the limitation.

During the '994 Patent prosecution, the Examiner found that the prior art "teaches or suggests analyzing breathing patterns to determine the different patient states as claimed." Appx7413. In traversing the rejection, NYU only argued that the prior art "does not disclose or suggest identifying either a REM sleep state or a troubled wakefulness state." Appx7413.

Similarly, during the '344 Patent prosecution, NYU admitted that the prior art "refers to the detection of wakefulness" but distinguished the prior art by arguing there is "no disclosure of a troubled wakefulness state." Appx7862. Notably, NYU did not seek to distinguish the prior art on the basis that it did not analyze breathing patterns, and did not discuss analysis of the amplitude and temporal structure of a waveform. *See* Appx7862-64.

Again, in the prosecution of the '009 Patent, the Examiner found the claims anticipated by the prior art. In distinguishing the prior art, NYU argued that the prior

10

art did not disclose an awake state. Appx6516. And again, there is no mention of analysis of amplitude and temporal structure of a waveform. *See id.*

### 3.     Claims on Appeal

The seven Challenged Patents are part of the same family. The '994 Patent is the original parent, and the remaining patents are continuations of a continuation-in-part to the '994 Patent. The Challenged Patents fall into two groups, and were referred to during the consolidated IPR hearing as the Asleep/Awake Patents ('009, '539, '155, '955, and '024) and Troubled Wakefulness Patents ('994 and '344).

All the Challenged Patents are directed to systems. Generally, the independent claims of the Asleep/Awake Patents require three components:

(1) generator supplying airflow and applying pressure;

(2) sensor measuring data corresponding to breathing patterns; and

(3) processor analyzing the breathing patterns to determine with the patient is asleep or awake.

The Troubled Wakefulness Patents as well as certain dependent claims of the Asleep/Awake Patents additionally require that the processor analyzing the breathing patterns determines whether the awake state is a troubled wakefulness state, among other limitations.

### C.     Prior Art at Issue

The Board found the challenged claims unpatentable as follows:

| Patent | Obvious over Sullivan995 in view of Sullivan460 (Asleep/Awake Claims) | Obvious over Sullivan995 in view of Sullivan460 and Matthews (Troubled Wakefulness Claims) |
|---|---|---|
| 9,108,009 | 1-11, 13-28, 30 | 12, 29 |
| 9,867,955 | 1-5, 8, 11, 12, 16-22, 24-26, 30, 31 | 6, 23 |
| 9,427,539 | 1, 2, 5-11, 13, 15-30 | |
| 9,533,115 | 1, 3-6, 9-12, 14-18, 20-24, 26-29 | 19 |
| 10,384,024 | 1-5, 7-14 | 6 |
| 6,988,994 | | 1, 6, 7, 10-14, 19-20, 23-30, 32 |
| 9,168,344 | | 1, 3, 7, 8, 11, 13 |

### 1.    Sullivan995

Sullivan995 discloses each limitation of the challenged claims, except determining the patient is in an awake state and further determining that awake state is a troubled wakefulness state. Sullivan995 discloses an auto-adjusting CPAP system that increases pressure upon detection of certain breathing patterns including snores or other abnormal sleep state breathing, and otherwise maintains or decreases pressure.

Specifically, the system "continuously sens[es] the patient's breathing patterns using [] one or more sensors." Appx8950 (17:66-17:67). This can include "an exhaled air flow volume, and inhaled air flow volume, breathing rate, and exhaled air flow rate, or an inhaled air flow rate." *Id.* (18:50-53). A computing system receives and processes the various breathing pattern data (e.g., snore, flow rate, volume, breathing rate), and outputs a control signal that can "increase[] the

speed of the electric motor 20," thereby "increas[ing] the output air pressure." Appx8946 (9:58-9:64, 10:6-10:12, 10:55-10:58); Appx8950 (17:6-17:12).

Figure 2A depicts an example of a patient's breathing pattern measured by the sensors.



FIG. 2A.

### 2.    Sullivan460

Sullivan460 builds on Sullivan995, incorporating Sullivan995 by reference and expressly stating that the system of Sullivan995 can be modified by the disclosures of Sullivan460:  "[T]he flow rate measurement means and the treatment means may be constructed together as part of one apparatus, such as the AutoSet product from ResMed described in US Patent No 5245955 [Sullivan995], the contents of which are incorporated by reference."  Appx8959 (6:22-6:29). Sullivan460 teaches determining an awake state.

Like Sullivan995, Sullivan460 describes an auto-adjusting CPAP system that applies higher pressure when an obstruction is detected.  Appx8959 (6:17-6:29); Appx8960   (7:3-7:12);   Appx8963   (10:9-10:33);   Appx8964   (11:10-11:13);

13

Appx8967 (14:7-14:30); Appx8969 (16:7-16:18); Appx8971-73. Sullivan460 further discloses that the system can detect when the patient is awake or asleep. Appx8959 (6:30-7:22); Appx8967 (14:7-14:36). Specifically, when the flow rate increases above a certain level, the controller determines the patient is in an awake state, and switches the CPAP system into a first mode that applies a reduced air pressure to the patient's airway. Appx8963 (10:21-10:25); Appx8967 (14:7-14:36). Conversely, when the flow rate decreases below a certain level, the controller determines the patient is in an asleep state, and switches the CPAP system into a second mode that applies an increased air pressure to the patient's airway to eliminate the patient's flow limitation. Appx8963 (10:3-10:16).

### 3.    Matthews

Like Sullivan995 and Sullivan460, Matthews is an auto-adjusting CPAP system that "optimizes the pressure delivered to the patient to treat…disordered breathing while minimizing the delivered pressure for patient comfort." Appx8978. Matthews teaches detecting erratic breathing to determine a troubled wakefulness state. Specifically, "[w]hen a patient is awake, in REM sleep, or in distress, breathing tends to be more erratic." Appx9011 (21:37-21:39). In such event, the Matthews system will "interrupt the auto-CPAP controller if the patient's breathing pattern becomes too variable." Appx9011 (21:39-21:41).

14

### D.    Proceedings Below

#### 1.    IPR Proceedings

In summer 2022, ResMed filed seven petitions for IPR requesting the Board find the challenged claims unpatentable as obvious.  In its preliminary responses, NYU did not raise any claim construction issues.

In December 2022, the Board instituted IPR proceedings on each petition.  In doing so, the Board noted that NYU did not "propose any express construction for a claim term."  Appx881; *see also* Appx1763-64; Appx2583; Appx3440; Appx4258; Appx5087; Appx5915.    And the Board ultimately found that "an express construction of any claim term is not necessary for purpose of this Decision."  *E.g.*, Appx1764.

In an attempt to evade invalidity, after institution NYU engineered its construction to inject an arbitrary temporal analysis requirement, and centered all its arguments on the alleged failure of the prior art to disclose this limitation.  NYU further argued that under this construction the prior art was not enabled, and that there would be no motivation to combine or reasonable expectation of success.

ResMed countered that NYU's construction had no basis in the intrinsic evidence or objective extrinsic evidence, and violated multiple tenets of claim construction.  NYU's tortured injection of temporal structure analysis was also futile.  The relevant prior art disclosure in Sullivan460, which determined that the

15

patient was asleep "when there is a reduced average airflow in the patient's upper airway," includes temporal analysis. Appx8960 (7:3-7:7, 7:10-7:12, 7:17-7:19). To determine whether there is "reduced" average airflow, the average airflow is taken at one point in time and compared to the average airflow at another point in time. Appx9815-16; Appx8959 (6:27-6:29); Appx8960 (7:17-7:19).

### 2. Final Written Decisions

In December 2023, the Board issued final written decisions in each IPR proceeding finding all the challenged claims unpatentable.

The Board first addressed claim construction, determining that the "analyzing the breathing patterns" terms should have their plain and ordinary meaning. *E.g.*, Appx25. The Board's analysis began with the claim language, finding that neither the terms in the proposed construction nor analysis of amplitude or temporal structure are recited in the claim language. Appx25-26. The Board further found that the claims do not recite distinguishing between "troubled wakefulness" and "REM sleep" or between "all awake and asleep states." *Id.* Nor do they require applying "the correct pressure" under all circumstances. *Id.* Rather, the processor analyzes data, without specifically reciting how the analysis is performed. *Id.*

The Board then turned to the specification. Appx26. The Board found no mention that analyzing breathing patterns requires analysis of a sequence of parameters and the order in which they appear in time. Appx27. The Board noted

that the specification instead expressly stated that the "determination can be made based on a number of different measurements." Appx28. The Board also reiterated the basic principle that "we do not read limitations from the embodiments in the specification into the claims." Appx26. And in response to NYU's argument that the construction was "implied lexicography," the Board distinguished the cited case law. Appx30.

The Board further observed that NYU's construction "relies nearly entirely on [its expert's] interpretation of the Specification, as opposed to any specific statements in the Specification." Appx31. The Board determined that NYU's expert's testimony is not supported sufficiently by the intrinsic record or other extrinsic evidence (e.g., objective extrinsic evidence) and, therefore, despite full consideration, gave it "little weight." *Id.*

The Board ultimately addressed the disclosures of the prior art and found that NYU's arguments did not distinguish the challenged claims from the combined teachings because the arguments were premised on NYU's faulty construction, and further were "not commensurate with the scope of the [challenged claims]." Notably, in three final written decisions, the Board expressly found that Sullivan460's determination that a patient is asleep "when there is reduced average flow" aligns with the Challenged Patents' disclosure of "low flow rates." Appx201; Appx283; Appx366.

## III.  SUMMARY OF THE ARGUMENT

The Board correctly declined to adopt NYU's proposed narrowing construction of the "analyzing the breathing patterns" terms, which is not supported by the intrinsic record and premised on several errors of law.  As the Board properly found, the plain and ordinary meaning of this simple phrase is broad enough to accommodate *all* embodiments discussed in the intrinsic record, including the specification and dependent claims.   In contrast, NYU's proposed 36-word construction would pick and choose from among the disclosed embodiments—importing limitations from some, while excluding others—in a transparent effort to avoid the prior art.

Contrary to NYU's assertion, the Board appropriately considered and rejected NYU's arguments and evidence.  *See* D.I. 18 ("Br.") at 17.  Of particular note, the Board correctly discarded NYU's belated theory of implied lexicography.  This case in no way resembles the past circumstances in which this Court has found an implied meaning for a claim term based on consistent, repeated, and exclusive disclosures in a patent specification.  Indeed, the words of NYU's proposed construction do not even appear in the specification or elsewhere in the intrinsic record.  Instead, they were contrived by NYU's expert, whose testimony the Board appropriately discounted as based on "several unsupported leaps" and contrary to the intrinsic record.  *E.g.*, Appx31.

NYU's challenges to the Board's obviousness determinations are premised on NYU's erroneous construction, and should be rejected on that basis alone. Regardless, the Board properly found that the Asleep/Awake Claims would have been obvious over Sullivan995 in view of Sullivan460. The Board also properly found that the Troubled Wakefulness Claims would have been obvious over Sullivan995 in view of Sullivan460 and Matthews. As the Board recognized, all three prior art references teach auto-adjusting CPAP systems that increased pressure to treat sleep disordered breathing while minimizing pressure when appropriate for the patient's comfort. Also as the Board found, a POSA could have and would have modified the system of Sullivan995 to include the sleep sensor of Sullivan460 to determine whether the patient was awake. And a POSA could have and would have further modified that system using the teachings of Matthews to determine that the patient was not only awake, but also experiencing irregular breathing (i.e., in a troubled wakefulness state). The Board's obviousness analysis is thorough, complete, and supported by substantial evidence. The Board's decisions should be affirmed.

## IV.    <u>ARGUMENT</u>

### A.    **Standards of Review**

The Court "review[s] the Board's ultimate claim construction and any supporting determinations based on intrinsic evidence de novo," and any "subsidiary

fact findings involving extrinsic evidence for substantial evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). Similarly, in reviewing the Board's obviousness determinations, the Court "review[s] the Board's legal conclusions de novo and its factual findings for substantial evidence." *Becton, Dickinson & Co. v. Baxter Corp. Englewood*, 998 F.3d 1337, 1339 (Fed. Cir. 2021).

"A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014). The mere "possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's findings from being supported by substantial evidence." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). Moreover, the Board's factual inquiries are affirmed as long as this Court "may reasonably discern that [the Board] followed a proper path, even if that path is less than perfectly clear." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015). Therefore, the substantial evidence standard is "a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

Under the Administrative Procedure Act, the Court must set aside conclusions or findings that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C.

§ 706(2)(A), (E). "The Board is obligated to provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions." *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019). The Board is not required to provide "perfect explanations," however, and this Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382-83 (Fed. Cir. 2016).

### B.   The Board Properly Construed the Claims

This Court should reject NYU's attempt to rewrite its claims to exclude the prior art. Before the Board, NYU sought to replace the simple "analyzing the breathing patterns" terms with an unwieldy 36-word phrase that appears nowhere in the intrinsic record: "determining a sequence of parameters each of which characterizes a single breath in a series of breaths from a flow waveform and examining the values of the parameters and the order which they appear in time." *E.g.*, Appx16-33. Unable to exclude the prior art on this construction alone, NYU further construes its construction to specifically require examination of "both the amplitude structure and the temporal structure of a breath-by-breath parameter time series." Appx16. As the Board recognized, NYU's proposed double-construction improperly sought "to import a significant number of limitations neither expressly recited nor suggested by the specific language of the claims." Appx26.

On appeal, NYU candidly admits that it seeks to rewrite its claims. According to NYU, its claims as drafted fail to capture the "fundamental innovation" and "inventive concept" of the Challenged Patents. Br. 20, 21. NYU contends that the plain claim language is "non-operational" and not "fully enable[d]" without the specific construction that it proposes. *Id.* 21. "This [C]ourt, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (collecting cases). Because "the patentee is required to 'define precisely what his invention is … it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)). This Court must, therefore, "construe the claim as written, not as the patentees wish they had written it." *Chef Am.*, 358 F.3d at 1374.

As discussed below, NYU provides no reason to depart from the plain and ordinary meaning of the "analyzing the breathing patterns" terms, which are used in accordance with their plain and ordinary meaning throughout the intrinsic record. The Board properly considered and rejected each of NYU's claim construction arguments, including its flawed theory of "implied lexicography" and its unsupported expert analysis. NYU's proposed construction, furthermore, would

improperly exclude certain embodiments described in the specification and contradict certain dependent claims.  This Court should therefore affirm the Board's decision to apply the plain and ordinary meaning.

### 1.    The Board Correctly Adopted the Plain and Ordinary Meaning of "Analyzing the Breathing Patterns"

The "analyzing the breathing patterns" terms should be given their plain and ordinary meaning—not limited to require the arbitrary analysis of both amplitude and temporal structures, as NYU asserts.  This Court has frequently stated that the words of a claim "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312.  Indeed, there is a "heavy presumption" that claim terms "carry their full ordinary and customary meaning."  *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (similar).

When construing a claim term, the entire context of the patent, including the specification and prosecution history, must be taken into consideration.  *Phillips*, 415 F.3d at 1313.  Here, nothing in the intrinsic record limits the "analyzing the breathing patterns" terms to analysis of either or both amplitude and temporal structures.  Instead, the claims, specification, and prosecution history use the claim terms in accordance with their plain and ordinary meaning.

23

a.    *Claims*

The claims alone are sufficient to dispose of NYU's proposed construction. As the Board noted, the independent claims do not recite "a sequence of parameters," "a series of breaths," "examining the values of the parameters and the order in which they appear in time," or an analysis of amplitude and temporal structures.  *E.g.*, Appx502.  Instead, the claims merely recite analyzing the breathing patterns without reciting how the analysis is performed.  *Id.*

Importantly, multiple claims from the Challenged Patents expressly recite analyses of breathing patterns that do ***not*** require analysis of temporal structures. For example, the Board found that a number of dependent claims of the '344 Patent recite breathing pattern analyses that require no temporal structure, including "a low flow rate" (cl. 8), "an absence of large breaths" (cl. 8), "a high respiratory rate" (cl. 8), and "pure mouth breathing" (cls. 5, 15).  Appx502-03.  In fact, there are other dependent claims beyond those the Board identified, including "airflow rate" ('539 patent, cl. 3; '994 patent, cl. 4) and "at least three obstructions" ('009 patent, cl. 27) that do not require an analysis of temporal structure.  *See* Appx611 (cl. 3); Appx661 (cl. 4); Appx598 (cl. 27).    Indeed, NYU's expert agreed that these claimed embodiments would be excluded from NYU's construction.  Appx9965-66 (121:16-122:24); Appx9998 (247:5-11).

24

NYU's construction should be rejected because it would exclude these explicitly claimed embodiments. *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 (Fed. Cir. 2020) (rejecting construction that excluded "explicitly claimed embodiments" in the dependent claims); *see also Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question … can also be valuable sources of enlightenment as to the meaning of a claim term.").

b.     *Specification*

The specification further confirms that "analyzing the breathing patterns" should be given its plain and ordinary meaning. To start, the specification does not include any reference to "a sequence of parameters," "a series of breaths," "examining the values of the parameters and the order in which they appear in time," or any of the other terms set forth in NYU's proposed construction, let alone any reference to an analysis of amplitude and temporal structures. Appx502. Indeed, the terms "amplitude" and "temporal" do not appear in the specification at all.

The specification instead establishes that any type of breathing pattern analysis meets "analyzing the breathing patterns." The specification describes how "processing arrangement 24 makes a determination as to the current state of the patient (e.g., whether the patient is asleep, awake and breathing regularly or awake and breathing irregularly due to distress or anxiousness)." *E.g.*, Appx674 (4:18-4:22). Indeed, the specification expressly explains that this "determination can be

25

made based on a number of different measurements." *Id.* (4:22-4:26). Importantly, the specification does not limit the analysis to any particular characteristic of a breathing pattern such as amplitude or temporal structures. *E.g.*, Appx669 (Figs. 3-8); Appx673-75 (2:41-2:43, 4:27-4:29; 4:53-4:58; 5:25-5:29). As the Board concluded, "[t]here is no mention that analyzing breathing patterns requires analyzing a sequence of parameters and the order in which they appear in time or analyzing amplitude and temporal structures of the waveform." Appx507. Thus, the specification further confirms that temporal analysis (and likewise amplitude analysis) is not required.

### c.   *Prosecution History*

The prosecution history of the Challenged Patents use the claim terms consistent with their plain meaning. During the '994 Patent prosecution, the Examiner found that the prior art "teaches or suggests analyzing breathing patterns to determine the different patient states as claimed." Appx7413. NYU only responded that "does not disclose or suggest identifying either a REM sleep state or a troubled wakefulness state." *Id*. NYU did not assert that the prior art was distinguishable because it applied any particular method of analysis, much less the analysis of amplitude and temporal structures.

During the '344 Patent prosecution, the Examiner found that the prior art taught a processing arrangement configured to "analyze the breathing patterns to

determine to which of the following states the detected breathing pattern is indicative." Appx7864. NYU merely responded that the prior art did not teach "a processing arrangement that distinguishes between regular wakefulness and troubled wakefulness." *Id.* Notably, NYU did not challenge the Examiner's finding that the prior art discloses "a processing arrangement configured to analyze the breathing patterns to determine…: (i) a REM sleep state." *Id.* Nor did NYU state or even suggest that the analysis of the breathing patterns would need to include the analysis of both amplitude and temporal structure to distinguish between a REM sleep state and troubled wakefulness state. *See id.*

Similarly, during the '009 Patent prosecution, the Examiner found the prior art taught "analyzes the data to determine the patient's breathing patterns" as claimed. Appx6479. Again, the applicant did not challenge this finding. *See* Appx6516. In no instance did the applicant ever attempt to distinguish the prior art based on an analysis of amplitude and temporal structures, so this Court should reject NYU's belated attempt to introduce those requirements now.

d.    *Extrinsic Evidence*

The term "analyzing the breathing patterns" has a straightforward meaning that does not require the analysis of amplitude and temporal structure. Notably, NYU's own expert obtained a contemporaneous patent that confirmed that analyzing the "rate of breathing" was a known type of breathing pattern analysis. Appx9789

(2:1-2:2), Appx9962 (108:8-108:19).   NYU's expert, in fact, acknowledged that "rate of breathing" falls under the ordinary meaning of the term, but argued that the Challenged Patents use a "special definition" of breathing pattern (not found anywhere in the intrinsic evidence).  *Id.* (108:20-109:7).

### 2.  The Board Properly Considered and Correctly Rejected NYU's Erroneous Narrowing Construction

NYU's arguments in favor of its proposed construction violate almost every basic claim construction principle in the book:

- *NYU's construction imports limitations from certain embodiments in the specification.*  *E.g.*, Br. 23-25, 26-27, 32-35.  But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

- *NYU's construction excludes certain embodiments in the specification and the dependent claims.*  *See, e.g.*, Appx502-03.  But "a claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003); *see also Baxalta*, 972 F.3d at 1346 (rejecting construction that excludes "explicitly claimed embodiments" recited in dependent claims).

28

- ***NYU's construction is based on the testimony of its expert, and appears nowhere in the intrinsic record.*** *E.g.*, Br. 25, 27-29, 31. But "evidence extrinsic to the patent and prosecution history, such as expert testimony, cannot be relied on to change the meaning of the claims when that meaning is made clear by those documents." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995).

- ***NYU asserts that its construction is necessary to cover what its inventors intended to claim.*** *E.g.*, Br. 21-22, 37. But "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc).

- ***NYU contends that its construction is necessary for the claims to be operable and enabled, and to preserve the validity of other patents.*** *E.g.*, Br. 21, 35-37. But "courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am.*, 358 F.3d at 1374.

This Court should reject NYU's proposed construction for all these reasons and more, as discussed further below.

        a.    *The specification discloses ways to distinguish troubled wakefulness and REM sleep without temporal analysis.*

NYU's manufactured construction is premised on the argument that temporal analysis is necessary to distinguish between the troubled wakefulness waveform in

Figure 7 and the REM sleep waveform in Figure 8.  Br. 20, 25-26.  But this premise is legally and factually flawed.

*First*, as discussed above, "courts may not redraft claims, whether to make them operable or to sustain their validity."  *Chef Am.*, 358 F.3d at 1374.  Thus, even if a plain meaning construction renders the claims inoperable or invalid, NYU cannot rewrite its claims.

*Second*, NYU's premise is just factually incorrect—temporal analysis is not required.  Rather, the specification and dependent claims expressly identify other ways to distinguish troubled wakefulness from REM sleep.  For example, the specification explains that "pure mouth breathing (e.g., no signal from the sensors 23 which is configured to detect the patient's airflow from the nose)" is indicative of troubled wakefulness.  Appx594 (4:47-4:54).  Indeed, dependent claims 5 and 15 of the '344 Patent expressly recite pure mouth breathing as a breathing pattern indicative of troubled wakefulness.  The specification also explains that "low flow rates" are indicative of REM sleep.  Appx595 (5:27-5:30).  And likewise, dependent claim 8 of the '344 Patent expressly recites a low flow rate as a breathing pattern indicative of REM sleep.  Appx677 (cl. 8).

Importantly, the specification expressly explains that "[t]hese differences in the pattern of the respiratory airflow signal [during REM sleep] from those seen during troubled wakefulness allow the separation of these states."  Appx595 (5:30-

5:33). Thus, the specifications disclose that the presence of one or more of the recited breathing patterns separate troubled wakefulness from REM sleep, not NYU's arbitrary temporal and amplitude structure analysis.

*Third*, this Court has repeatedly "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002). This is especially true here, where the only basis for NYU's construction is its expert's "crude" interpretation of Figures 7 and 8, performed by "approximating" the amplitudes of each breath in the figure, "estimat[ing] by eye…the size of those individual breaths." Appx9954-55 (75:11-76:14, 78:16-79:19). The Board properly gave NYU's expert's testimony "little weight," finding that it "is not supported sufficiently by the intrinsic record or other extrinsic evidence (e.g., objective extrinsic evidence)" and dependent on "several unsupported leaps." *See, e.g.*, Appx31; Appx509-10.

*Fourth*, "it is important not to import into a claim limitations that are not a part of the claim." *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Troubled wakefulness is not part of the "analyzing the breathing patterns" terms. In fact, troubled wakefulness does not appear in any claim of the '539 Patent. The claim language is much broader, and does not require "analyzing the breathing patterns" to specifically identify breathing patterns

indicative of "troubled wakefulness." And the claim language certainly does not limit "analyzing the breathing patterns" to distinguishing the waveforms in Figure 7 and 8. Indeed, even for the "troubled wakefulness" claims, the specification explains that the breathing patterns identified are merely exemplary; other breathing patterns may be used to indicate troubled wakefulness. *See, e.g.,* Appx594 (4:47-4:48) ("the following ***exemplary*** characteristics ***may*** suggest that the patient is awake and anxious or distressed" (emphasis added)).

*Fifth*, "a specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes." *ScriptPro LLC v. Innovation Assoc., Inc.,* 833 F.3d 1336, 1341 (Fed. Cir. 2016). NYU argues that its construction is necessary to include the inventive concept. Even if temporal analysis is required to determine troubled wakefulness (it is not), the Challenged Patents are not limited to distinguishing troubled wakefulness. Rather, the Challenged Patents, particularly the Asleep/Awake Patents, merely determine whether the patient is asleep or awake by any type of breathing pattern analysis. Temporal analysis is unnecessary for that determination.

        b.    *The dependent claims do not support NYU's proposed construction.*

NYU argues that the dependent claims support its construction. Br. 49-51. As discussed above, they do not. *See supra* Section IV.B.1.a.

NYU counters that "[t]he presence of specific breathing patterns in dependent claims…does not negate the need for the ***broader analysis*** required to distinguish all awake and asleep states." Br. 50 (emphasis added). But that is the problem. NYU is not broadening the "analyzing the breathing patterns" terms to include examining temporal structures. NYU is seeking to ***narrow*** the terms, requiring the examination of temporal structure to meet the claim terms. This requirement directly conflicts with the basic tenet that dependent claims cannot be broader than the claim from which they depend. *Littlefuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("[I]f a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well.").

NYU asserts that the independent claims can still require amplitude and temporal structure analysis even if the specific breathing patterns recited in the dependent claims do not. *See* Br. 51. But NYU's argument is foreclosed by the language of the dependent claims themselves. For example, claim 5 of the '344 Patent recites that "the breathing patterns" of claim 1 "comprise ***one*** or more patterns selected from the group consisting of (a) pure mouth breathing." Appx677 (9:55-10:3). Accordingly, claim 5 covers the scenario where just one breathing pattern is analyzed, and that breathing pattern is exclusively pure mouth breathing. Because NYU's expert agrees that pure mouth breathing does not require temporal structure

analysis (Appx10008 (288:14-289:3)), the analysis of breathing patterns recited in claim 1 cannot require temporal structure analysis either. NYU's argument fails to account for this basic logical inference.

NYU's reliance on *Alcon Research* for this very principle only supports ResMed. *See* Br. 50-51 (citing *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012)). There, this Court explained that "[i]t is axiomatic that a dependent claim cannot be broader than the claim from which it depends." *Alcon*, 687 F.3d at 1367. Applying that principle, the Court concluded that "the concentrations recited in the…dependent claims must necessarily meet claim 1's limitations." *Id.* So too here. The analyses of breathing patterns recited in the dependent claims must necessarily meet the limitations recited in the independent claims. For example, the "pure mouth breathing" of claim 5 of the '344 Patent must necessarily meet the "analyzing the breathing patterns" of claim 1 of the '344 Patent. Under plain and ordinary meaning, it does. Under NYU's proposed construction, it does not.

c.    *NYU provides no legal or factual basis for "implied lexicography."*

NYU did not act as its own lexicographer to redefine the claim phrase "analyzing the breathing patterns." To act as its own lexicographer, a "patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and "must clearly express an intent to redefine the terms."

34

*Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1044 (Fed. Cir. 2019). It is insufficient for the patentee to have only disclosed a single embodiment or even to have used a word in the same manner in all embodiments. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). Rather, the patentee's chosen definition must be "clearly and unambiguously defined" in the patent specification or file history for it to override a term's plain and ordinary meaning. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582, 1585 (Fed. Cir. 1996). That is particularly the case where, as here, the claim language at issue is "plain, lacking a range of possible ordinary meanings in context." *Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015).

NYU admits there is no "clear expression of intent to redefine the phrase" within the Challenged Patents, but still insists that "implied lexicography" applies. Br. 41-47. But NYU did not assert implied lexicography when it first presented its proposed construction to the Board. Instead, NYU first introduced this argument in its Sur-Replies, after ResMed had already submitted its final papers in the IPR proceedings. In support, NYU primarily relied on this Court's decision in *AstraZeneca AB v. Mut. Pharm. Co., Inc.*, 384 F.3d 1333 (Fed. Cir. 2004). *See, e.g.*, Appx1074-75. The Board rejected NYU's belated theory of implied lexicography, finding the specifications of the Challenged Patents "easily distinguishable from the specification at issue in *AstraZeneca AB*." *E.g.*, Appx504-06. On appeal, NYU now

abandons its attempt to analogize *AstraZeneca AB* in favor of new cases that it never presented to the Board.  Br. 41-47.

But NYU's new cases are just as easily distinguished.  *See id.*  In *Columbia*, this Court relied on clear limiting descriptions of the invention in the specification and prosecution history to find lexicography.  *See Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362-71 (Fed. Cir. 2016).  For example, the claim term "byte sequence feature" was properly limited to only include machine code instructions, without any resource information, based on explicit disclosures in the specification.  *Id.* at 1364-67.  The Court observed that, "[t]wice in the specification, the patentee states that the 'byte sequence feature' is useful and informative 'because it represents the machine code in an executable.'" *Id.* at 1365.  The Court held that those were definitional statements, and "not simply descriptions of the preferred embodiment."  *Id.*  The Court then looked to other ***express*** disclosures in the specification that further confirmed that a "byte sequence feature" could not include resource information.  *Id.* at 1366.  For example, the lack of resource information was what distinguished "byte sequence feature" from other, more general "feature" embodiments described in the specification.  *Id.*

NYU does not attempt to analogize *Columbia* on its facts—nor could it, for there are no similar limiting descriptions in the specification of the Challenged Patents.  *See* Br. 41-42.  As the Board observed, the specification lacks any express

references to an analysis of amplitude or temporal structures, or other terms set forth in NYU's proposed construction, such as "a sequence of parameters," "a series of breaths," or "examining the values of the parameters and the order in which they appear in time." *E.g.*, Appx505-06. Indeed, NYU does not dispute that the terms "amplitude" and "temporal" do not even appear in the specification. *Id.*[2]

So too for *Bell Atlantic* and *Abbott*, which required similarly clear and consistent disclosures in the specification to define a claim term by implication. *See* Br. 42-43, 46-47 (citing *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) and *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012)). In *Bell Atlantic*, the term "mode" was used consistently throughout the specification in a way that distinguished it from the term "rate." 262 F.3d at 1271-73. This Court explained that "when a patentee uses a claim term ***throughout the entire patent specification***, ***in a manner consistent with only a single meaning***, he has defined that term 'by implication.'" *Id.* at 1271 (emphasis added). The Court also noted that "the ordinary meaning of the non-technical term 'mode' is sufficiently broad and amorphous that the scope of the claim language can be reconciled only with recourse to the written description." *Id.* at 1269-70. In

---

[2]    In addressing *Columbia*, NYU includes a paragraph discussing the role of dictionaries in claim construction. Br. 42. It is unclear what part of the Board's opinion this paragraph is intended to address. The Board did not rely on any dictionary definitions in support of its claim construction analysis. ResMed reserves its right to respond should NYU clarify the relevance of this argument on reply.

*Abbott*, this Court construed the term "electrochemical sensor" to exclude external cables and wires where the patents "***repeatedly, consistently, and exclusively***" suggested connectivity without the inclusion of cables or wires. 696 F.3d at 1148-50. Every embodiment in the specification showed an electrochemical sensor without cables or wires, and the only mention of a sensor with external cables or wires was a disparaging remark about the prior art. *Id.* at 1149-50.

NYU fails to analogize this case to the facts of *Bell Atlantic* and *Abbott*. *See* Br. 42-47. NYU does not, and cannot, show usage of the claim terms throughout the specification in a manner consistent with the meaning that NYU seeks with its proposed construction. *See Bell Atl.*, 262 F.3d at 1271. NYU does not, and cannot, identify repeated, consistent, and exclusive disclosure of embodiments that analyze both the amplitude and temporal structure of breathing patterns. *See Abbott*, 696 F.3d at 1150. Nor is the phrase "analyzing the breathing patterns" so broad and amorphous (like the term "mode") that it can only be reconciled by recourse to the written description. *See Bell Atl.*, 262 F.3d at 1269-70.

To the contrary, the specification makes clear that "[t]here are a number of characteristics of the patient's breathing patterns that may be taken into account in making" a determination of the current state of the patient. Appx594 (4:28-4:30). Thus, the specification does not require that approach to include analyzing the

38

amplitude and temporal structures of the waveform.  Appx676 (7:11-7:13); *see also, e.g.*, Appx506-07.

NYU points to several passages of the specification as supporting implied lexicography, but none of these disclosures rise to the level of the clear, consistent, repeated, and exclusive disclosures that this Court previously found sufficient for implied lexicography.  Br. 43-47 (citing Appx594 (4:38-46 & 4:54-61); Appx595 (5:25-34 & 6:33-39)).[3]  NYU first contends that the Board "overlooked" a passage of the specification discussing apnea and hypopnea, Br. 43, but the Board expressly addressed that disclosure.  *E.g.*, Appx506 (citing '344 Patent at 4:37-45).   As the Board found, the passage describes "[i]ndices of sleep disordered breathing," and "does not describe an analysis of a sequence of parameters and the order in which they appear in time, much less the amplitude and temporal aspects of the waveform." *Id.*  NYU next refers to Figures 7 and 8 their accompanying descriptions, Br. 44, but as the Board recognized, Figures 7 and 8 are merely examples.  *E.g.*, Appx507; *see also Columbia*, 811 F.3d at 1365 (distinguishing between definitional statements and descriptions of the preferred embodiment).   The Board further found that the description of Figure 8 excerpted by NYU expressly includes breathing patterns that do not require an analysis of temporal structures—"high respiratory rates" and "low

---

[3]  NYU also includes broader citations to these same passages in support of its argument.  Br. 46 (citing Appx594 (4:28-61), Appx595 (5:18-34)).

flow rates." Appx507. That subsidiary fact finding is supported by substantial evidence and is entitled to deference on appeal. *See id*; *see also, e.g.*, Appx49 (citing Appx6058 and supporting evidence where Petitioner argued, inter alia, that "a low flow rate" and "a high respiratory rate" require no temporal structure). Finally, NYU turns to the testimony of its expert, Dr. Bates. Br. 45. The Board appropriately discounted that extrinsic evidence as insufficiently supported by the intrinsic record or other extrinsic evidence. *E.g.*, Appx509-10 ("Dr. Bates reads portions of the Specification and extrapolates, by taking several unsupported leaps, that the '344 patent 'implicitly demands certain parameter measurements.'"). The Board's evaluation of the reliability of Dr. Bates's testimony is entitled to deference on appeal. *See, e.g.*, *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010).

At bottom, NYU fails to identify any disclosures even remotely approaching those that were before the Court in cases like *Columbia*, *Bell Atlantic*, and *Abbott*. Like the Board, this Court should reject NYU's belated theory of implied lexicography as unsupported by the record.

### 3.    NYU's Criticisms of the Board's Analysis are Unavailing

#### a.    *The Board did not misapprehend NYU's arguments.*

NYU presents two throwaway arguments that the Board misapprehended its claim construction arguments. Br. 47-49. Both fail. First, NYU asserts that: "According to the Board, NYU's interpretation did not sufficiently narrow the scope

of these claims, which are intended to encompass additional awake and asleep states." *Id.* at 47. Incorrect. The Board did not find that NYU's construction was "not sufficiently narrow." Rather, the Board found the opposite—NYU's construction was too narrow. Appx25-26; Appx30; Appx109; Appx113-14; Appx182-83; Appx261; Appx343; *see also* Section IV.B.2.b, *supra*. As the Board correctly recognized, NYU's construction is improper because it would have excluded certain breathing pattern analyses distinguishing awake and asleep states that fall within the literal scope of the claims. Appx25-26; Appx30.

*Second*, NYU asserts that the Board overlooked that its proposed construction could address Figures 3-6 of the Challenged Patents. Br. 48-49. Incorrect. The Board considered and rejected NYU's arguments. As the Board explained, NYU focused entirely on Figures 7 and 8. Appx29. NYU never explained how Figures 3-6, which show other awake and asleep states, necessitated its proposed construction. Appx30. Its argument also misses the point. Even assuming that NYU's construction **could** accommodate Figures 3-6, that does not provide any basis to **require** NYU's construction. Regardless, because NYU never presented any argument to the Board, its argument regarding Figures 3-6 is forfeited on appeal.

b. *The Board's decision is consistent with case law.*

To support its construction, NYU cites to decisions **rejecting** improper narrowing constructions to argue that the Board should have **accepted** a narrowing

construction here.  *See, e.g.*, Br. 30-31, 33-35.  But those cases provide no support to NYU despite NYU's attempt to turn them on their head.

In *Intel v. Qualcomm* (*id.* at 30-31 (discussing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021)), this Court considered a claim construction that, similar here, only served to exclude the prior art at issue.  *See* 21 F.4th at 808-12. Specifically, the Board construed "hardware buffer" to exclude the "temporary buffers" taught in the prior art but failed to explain what constitutes a "temporary buffer."  *Id.* at 806-07, 810-11.[4]  This Court did not resolve the claim construction dispute, but instead vacated and remanded for a more fulsome claim construction analysis by the Board.  *Id.* at 811-12.  In contrast to *Intel*, here the Board ***declined*** to adopt NYU's improperly narrowing construction.  And far from "superficial," Br. 31, here the Board provided a detailed analysis of the evidence.  Appx25-31; Appx109-15; Appx178-84; Appx256-62; Appx338-45; Appx427-32; Appx501-10.

Specifically, the Board expressly considered the apnea and hypopnea disclosures cited by NYU.  *See* Br. 32-33 (citing Appx594 at 4:38-46).  After evaluating those disclosures in context (context that NYU ignores on appeal), the Board concluded that they "do[] not describe analysis of a sequence of parameters and the order in which they appear in time, much less the amplitude and temporal

---

[4]  In *Intel*, the Board applied the broadest reasonable interpretation standard, which is different from the *Phillips* standard applicable here.  21 F.4th at 808.

aspects of the waveform." *E.g.*, Appx28-29. The Board also expressly considered the specification's discussion of Figures 7 and 8. *See* Br. 32-33 (citing Appx594 (4:54-59), Appx595 (5:27-30)). The Board evaluated these disclosures and concluded that they are, at most, examples. *E.g.*, Appx29-30. The Board also identified other examples in the specification that do not require analysis of both amplitude and temporal structures—examples that NYU had failed to address and continues to ignore on appeal. *E.g.*, Appx30 (discussing Figs. 3-6 of the '009 patent).

NYU's reliance on *EPOS v. Pegasus* is similarly misplaced. *See* Br. 33-34 (citing *EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338 (Fed. Cir. 2014)). Indeed, *EPOS* forecloses NYU's construction. In *EPOS*, this Court rejected two narrowing constructions that each would have erroneously imported a limitation from a preferred embodiment. 766 F.3d at 1342-44 (rejecting "drawing implement" and "given time interval" constructions). That is exactly what NYU seeks to do here with its construction, importing limitations purportedly disclosed by the examples in Figures 7 and 8. *See, e.g.*, Appx29. The *EPOS* Court also rejected a narrowing construction that would have erroneously excluded a preferred embodiment. 766 F.3d at 1345-47 (rejecting "temporary attachment" construction). NYU's construction, which excludes at least the "low flow rate" embodiment, does the same. *See, e.g.*, Appx23 (citing Appx594 (3:55-61)); Appx502-03. Finally, the

*EPOS* Court explained that the specification included "broad disclosures," and "nothing" in the patent limited the claim term to a particular implementation. 766 F.3d at 1344-45 (rejecting "marking implement" construction). The same reasoning applies here, where the language of NYU's proposed construction appears nowhere, and there are no limiting statements in the Challenged Patents. *See, e.g.*, Appx28-29 (observing that "it is undisputed that words like 'amplitude' and 'temporal' do not appear in the Specification").

NYU's remaining cases all similarly reinforce that NYU's construction is improper. *See* Br. 34-35 (citing *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996), *Vitronics*, 90 F.3d at 1583). In *Core Wireless*, this Court rejected the patentee's proposed construction that would have excluded preferred embodiments. 880 F.3d at 1366-67. The Court also relied on the use of relevant claim terms in the specification to determine the appropriate construction*, id.* at 1365-66 (evaluating use of "display" and "launch" in specification), and noted a lack of any prosecution disclaimer. *Id.* at 1367-68. In *Hoechst* and *Vitronics*, this Court likewise rejected proposed constructions that would have excluded preferred embodiments. *Hoechst*, 78 F.3d at 1580-81; *Vitronics*, 90 F.3d at 1583-84. The *Vitronics* Court also warned against the consideration of expert testimony "to vary or contradict the manifest meaning of the claims." 90 F.3d at 1584-85. All these

considerations weigh against NYU's proposed construction, where (i) it would exclude embodiments; (ii) the language of its construction is not present in the specification; (iii) the expert testimony would vary the plain meaning of the claims; and (iv) there is no explicit lexicography or disclaimer.

The Board's construction, by contrast, does not exclude any embodiment described in the specification. Far from "dismiss[ing] the preferred embodiment," the Board's construction encompasses ***all*** the embodiments described in the specification, including the example described by Figure 8. *See* Br. 35 (citing Appx595 at 5:17-33). NYU does not, and cannot, assert that Figure 8 is outside the literal scope of the plain and ordinary meaning of the claims. *See id.* Even assuming that distinguishing the patterns in Figure 8 requires an analysis of both amplitude and temporal structures, *id.*, that analysis falls within "analyzing the breathing patterns," and NYU's open-ended "comprising" claims do not preclude additional analysis.

NYU complains that the Board did not explain "how the claims remain fully enabled" under their plain and ordinary meaning, how the plain and ordinary meaning of its claims "fulfills the invention's objectives," or how the claims' scope comports with "the inventors' intent." Br. 35-37. NYU cites no authority for imposing these obligations upon the Board. *See id.* Indeed, the Board must "construe the claim as written, not as the patentees wish they had written it." *Id.*

And, as this Court has explained, "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." *Markman*, 52 F.3d at 985.

> c.   *The Board appropriately addressed all claim construction issues necessary to its decision.*

NYU contends that the Board did not resolve "conflicting expert testimonies" or define the plain and ordinary meaning of "analyzing the breathing patterns." Br. 37-40.  NYU even faults the Board for failing to consider the collateral impact of its plain and ordinary meaning interpretation on the validity of "any other patent or application containing this term." *Id.*  NYU's arguments lack any merit.

As an initial matter, the Board did resolve the conflicting expert testimony before it.  As the Board explained, it discounted the testimony of NYU's expert, Dr. Bates, because it was "not supported sufficiently by the intrinsic record or other extrinsic evidence," and took "several unsupported leaps." *E.g.*, Appx31.  The Board is entitled to make such credibility determinations. *See, e.g.*, *Regents of the Univ. of Minn. v. Gilead Scis., Inc.*, 61 F.4th 1350, 1359 (Fed. Cir. 2023); *Yorkey*, 601 F.3d at 1284 ("We defer to the Board's findings concerning the credibility of expert witnesses.").  The Board adequately explained its rationale, which is supported by substantial evidence. *E.g.*, Appx24-25; Appx31.

Rather than resolve NYU's abstract questions about its claims' scope, Br. 37-38, the Board properly focused instead on the specific question before it: whether the asserted prior art renders the challenged claims unpatentable. The Board only needs to construe terms "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). The Board did exactly that when it held that "analyzing the breathing patterns" is not limited to analyses that include both amplitude and temporal structures.

NYU's cited case law is completely inapposite. NYU relies on *Irdeto* for the principle that there is no "heavy presumption" of plain and ordinary meaning when a claim term has no plain and ordinary meaning. Br. 38-39 (citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)). A reasonable factfinder could conclude that Dr. Bates' testimony—that the simple English phrase "analyzing the breathing patterns" has no plain and ordinary meaning—was unreliable. *See Phillips*, 415 F.3d at 1318 (explaining that expert testimony "generated at the time of and for the purpose of litigation … can suffer from bias that is not present in intrinsic evidence"). And the Board did so here. *E.g.*, Appx31.

Beyond *Irdeto*, NYU cites to two non-precedential cases that are irrelevant to the issues in this appeal. Br. 39 (citing *Laitram, LLC v. Ashworth Bros., Inc.*, 2023 U.S. App. LEXIS 11789, *7 (Fed. Cir. May 15, 2023) (addressing "slight difference" in wording of construction); *Surgalign Spine Tech., Inc. v. LifeNet Health*, 2022 U.S.

App. LEXIS 9592, *26 (Fed. Cir. April 11, 2022) (rejecting implied meaning where ordinary meaning was uncontested)).  NYU even attempts to invoke *O2 Micro*, but fails to explain how any *O2 Micro* issue is present here (there is none).  Br. 39-40 (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)).  At bottom, NYU fails to identify any authority for its proposition that the Board was required to construe the claims to resolve unidentified abstract questions beyond the patentability of the challenged claims.

### C.    The Board's Obviousness Determinations are Correct and Supported by Substantial Evidence

As NYU itself stated, the "crux of this appeal concerns the appropriate construction of the term "analyzing the breathing patterns."  Br. 20.  As such (and perhaps unsurprisingly), the remainder of NYU's arguments generally just re-package some version of its claim construction arguments.  But the Board properly rejected those arguments in considering claim construction, and once again, in analyzing and finding that the challenged claims are obvious.

### 1.    NYU's Enablement Challenge to Sullivan460 is Contrary to Law

NYU fails to identify a standard for challenging the enablement of Sullivan460 as prior art, pointing, instead, to a framework to analyze enablement of anticipation, rather than obviousness prior art references.  Contrary to NYU's assertions, "[e]nablement of the prior art is ***not*** a requirement to prove invalidity

48

under § 103." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) (emphasis added).

NYU attempts to invoke *In re Morsa* as describing a procedural burden-shifting requirement to assess the enablement of obviousness prior art references. Br. 53 (citing 713 F.3d 104, 109-10 (Fed. Cir. 2013)). But NYU is mistaken. The procedural burden-shifting for enablement in *Morsa* is for anticipation under 35 U.S.C. § 102, not obviousness under § 103. 713 F.3d at 109-10 ("Since both the Board and the examiner failed to engage in a proper enablement analysis, we vacate the finding of anticipation and remand … for further proceedings"). The *Morsa* Court did not raise enablement of those very same references in its obviousness analysis; the Court performed a full obviousness analysis based on what the references disclosed. *Id.* at 110.

*Amgen* (to which *Morsa* cites) further confirms this distinction. 314 F.3d 1313, 1355-57 (Fed. Cir. 2003). Although the Court laid out a burden-shifting enablement framework for an "anticipation inquiry," the Court was clear that the same framework did not apply to obviousness references. *Compare Amgen*, 314 F.3d at 1355 ("If a patentee presents evidence of nonenablement that a trial court finds persuasive, the trial court must then exclude that particular prior art patent in any anticipation inquiry."), *with id.* at 1357 ("Under § 103, however, a reference need not be enabled; it qualifies as a prior art, regardless, for whatever is disclosed

49

therein."). The case was remanded for the district court to reconsider obviousness "without reference to whether… [the prior art] is enabled." *Id.*

### 2. The Board Properly Rejected NYU's Argument That Sullivan460 is Not Enabled

Even if enablement was required for an obviousness reference (and it is not), the Board still found that Sullivan460 was enabled, a finding that was supported by substantial evidence. The Board did not find persuasive NYU's arguments that Sullivan460 is non-enabling for determining an awake state. Appx133-34; Appx206; Appx286.

One way Sullivan460 teaches analyzing breathing patterns to determine an awake state is by comparing a measured flow rate to a preset flow rate. Appx8963 (10:21-10:25). NYU counters that Sullivan460 is not enabled because it "does not describe how… [the] preset flow rate is determined" and that "this preset rate would not be applicable at the end of inspiration." Br. 53-54. But NYU's evidence for its position consisted only of one line of deposition testimony from Dr. Kirkness that he did not know "how a preset level is calculated from a [single] sentence in Sullivan460." Appx133; Appx214; Appx286; Appx455; Appx527. NYU admits in a footnote, however, that Dr. Kirkness later testified that a preset level could be calculated using "a mathematical processing function that takes input from a flow sensor." Br. 54 n.24; Appx11325 (38:2-38:16). This was consistent with

Dr. Kirkness's testimony in his reply declaration, citing corroborating contemporary references. Appx9806.

After reiterating that enablement is not required for obviousness references (as discussed above), the Board then went on to reject NYU's argument and find that Sullivan460 was enabled. Appx39, Appx133-34, Appx206-07, Appx286-87, Appx373-74, Appx457-58, Appx527-28. Specifically, the Board agreed with ResMed that a POSA would have understood how to calculate a preset level for a flow rate based on, for instance, the disclosure in Sullivan995 regarding the calculation of predetermined values for flow rates. Appx8950 (17:14-17:18); Appx134; Appx207, Appx287, Appx374, Appx457-58, Appx527-28. The Board credited ResMed's arguments because "they [we]re supported by the asserted references." *E.g.*, Appx134.

In contrast, NYU's arguments were not supported by any references or other evidence. And given that Sullivan460 incorporated Sullivan995 by reference, the Board was also persuaded that a POSA would have understood that the preset level was predetermined and would know how to calculate it. Appx134-35, Appx207, Appx286-87, Appx374, Appx457-58, Appx527-28. NYU argues the resort to Sullivan995 to enable the preset flow rate "admits that Sullivan460 itself does not provide the necessary details," and NYU further complains that Sullivan995 "lacks explicit instructions for calculating these values." Br. 54. But calculating a preset

value was well-known in the art and neither reference need disclose that which was already well-known in the art. *See, e.g.*, Appx9806; *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261 (Fed. Cir. 2017) ("a patent need not teach, and preferably omits, what is well known in the art").

NYU also argues "Sullivan460's method of detecting respiratory effort via a movement sensor is…problematic" due to "the challenges posed by using a movement sensor to detect respiration." Br. 54-55. But the movement sensor is irrelevant. Sullivan460 discloses a number of different ways to implement the sleep sensor, and although the movement sensor is one, neither ResMed nor the Board relied on that disclosure for the "analyzing the breathing patterns" limitation. That the Board purportedly did not "substantively" address such a specious argument is not "error," as the Board need not address every argument to resolve the case. *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1347 (Fed. Cir. 2023) ("[T]he Board is not require[d]…to address every argument raised by a party or explain every possible reason supporting its conclusion.").

The Board's analysis of Sullivan460's enablement was robust, and its findings were based the substantial evidence outlined above. The Board's rejection of NYU's unsupported arguments is not "error."

### 3. Substantial Evidence Supports the Board's Finding That Sullivan460 Teaches Determining Asleep/Awake States

The Board determined that Sullivan460 expressly discloses that it can "distinguish between awake and asleep states." Appx372; Appx56-57. NYU attempts to argue that the Board's support for the foregoing conclusion is lacking because it only "describes activation of a second treatment mode after the patient is asleep." Br. 58. NYU's argument ignores the Board's reliance on Sullivan460's explicit teachings of detection of an awake state, which represents substantial evidence. The Board highlights the two operation modes described in Sullivan460. *E.g.*, Appx38-39. And NYU ignores the Board's fulsome discussion on how the awake state is detected in Sullivan460 when the flow rate increases above a preset level, which indicates that the patient is awake. Appx8963 (10:21-10:25); *see also* discussion *infra*.

NYU attempts to argue that 'disclosing' an awake state would be different than "determining an awake state." Br. 52. This argument is nonsensical. The Board found that the Sullivan460 device could switch between first and second modes, explicitly demonstrating that Sullivan460 detects the awake state. *See* Appx47; Appx132-33; Appx205-06; Appx285; Appx372; Appx458; Appx528. NYU does not and cannot identify any evidence showing that a POSA would not have understood Sullivan460 to teach detection of an awake state.

Although NYU argues that Sullivan460 only determines when a patient has fallen asleep, where the system then enters a second mode after the patient is "presumed" to be awake in the first mode, Br. 56-58, its conclusion is belied by the explicit teachings of Sullivan460.  Appx8963 (10:17-10:25).  NYU quibbles over the word "assumed," arguing that the presence of the word means that Sullivan460 does not detect the awake state, but, again, NYU presents no evidence that a POSA would not have understood the foregoing passage to teach detection of an awake state through measurement of a "flow rate increase above the preset level."  Br. 57-58.

NYU's further arguments that Sullivan460 does not teach an awake state are similarly unsupported by the evidence, as well as irrelevant.  *See* Br. 58-59.  First, as the Board found, this argument is premised on NYU's incorrect construction. Appx56.  Second, the Board found that this argument was directly contrary to the express disclosure in Sullivan460, that the high pressure "as soon as the patient goes to sleep." *Id.*  Third, this argument reflects NYU's misunderstanding of the law.  So long as a POSA understands Sullivan460 to disclose just one embodiment in which the CPAP system would decrease the pressure when the patient is awake, Sullivan460 discloses NYU's claimed invention.  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for

everything that it teaches, not simply the described invention or a preferred embodiment.").

Next, NYU's complaint that "the system should only apply increased pressure when there are clear signs that the patient is becoming obstructed, not merely because the patient has fallen asleep" demonstrates selective reading of Sullivan460. Br. 59. As NYU notes, Sullivan460 discloses a CPAP system. The primary goal of such a system, generally, is to treat "upper airway flow limitation(s) in a patient" where "the treatment means provides a relatively greater air and pressure delivery to the patient" "which is sufficient to treat an air flow limitation." Appx8954 (1:5-1:6); Appx8959-60 (6:35-7:2). Sullivan460 builds on prior art CPAP devices like that disclosed in Sullivan995 and adds, in one embodiment, a mechanism to reduce patient discomfort by reducing the pressure applied by the system when a patient is awake. *See* Appx8959 (6:22-6:29). NYU's reading that the Sullivan460 device would not increase the pressure when a patient is experiencing obstructions/air flow limitations is directly contrary to Sullivan460's teachings.

NYU also argues that "if Sullivan995 and Sullivan460 were combined, they fail to teach how to accurately distinguish between *all* awake and asleep states," an argument that merely repeats NYU's tired mantra that "analyzing the breathing patterns" must be able to determine a troubled wakefulness state. Br. 59. But as

discussed above, the "analyzing the breathing patterns" term is not so narrow. *See supra* Section IV.B.2.d.

Finally, NYU's argument that the Board "failed to consider NYU's assertion that without analyzing amplitude and structural components, it is possible to confuse awake and asleep states" such that "Sullivan460 could apply higher pressure while the patient is still awake" is based on a regurgitation of its incorrect claim construction arguments and a mischaracterization of the Board's analysis. Br. 60. The Board considered, but did not credit, NYU's arguments that there was a requirement to analyze amplitude and temporal structure to analyze breathing patterns in order to determine awake and asleep states. Appx32; Appx115-16; Appx185; Appx262; Appx345; Appx433; Appx510. Further, the Board found that the claims did not require applying "the correct pressure" under all circumstances. *See, e.g.,* Appx25-26. Because the bulk of NYU's non-obviousness arguments relied on its erroneous claim construction, the Board's rejection of that construction was dispositive. The Board need only address issues that resolve the case before it. *Medtronic*, 70 F.4th at 1347. The Board addressed the necessary issues, and the Board's conclusion that Sullivan460 teaches an awake state was supported by substantial evidence.

### 4. NYU's Argument That the Prior Art Does Not Disclose Obstructions is Contrary to Substantial Evidence

NYU erroneously argues that neither Sullivan995 nor Sullivan460 teach CPAP systems that detect snores as obstructions and, consequently, that the Board's finding of such was in error. Br. 61-63. First, substantial evidence in the record supports the Board's determination that a POSA would understand snores to represent airway obstructions. *See, e.g.*, Appx48; Appx52-53; Appx202-03. NYU points to no evidence to the contrary.

Second, NYU's citation to certain disclosures of Sullivan460 and Sullivan995 as not teaching that snores are indicative of obstructions is selective and devoid of context. Br. 61-63. As the Board found, Sullivan995 discloses that snores correspond to obstructions. *See, e.g.*, Appx48 ("Petitioner shows that Sullivan995 teaches when a 'sequence of snores is detected'" the pressure is increased and "'expressly illustrates that four (4) snores are detected' corresponding to a combination of obstructions"), Appx53 (similar). In particular, Sullivan995 teaches "[s]leep apnea is characterized by complete occlusion of the upper airway passage during sleep ***while snoring is characterized by partial occlusion***." Appx8942 (1:22-1:24) (emphasis added). Notably, Sullivan995 teaches: "The detection apparatus 22 will then respond to a snore, or snore pattern, and via the processor 26 increase the motor speed such that CPAP pressure increases by 1 cm H20 for each snore detected." Appx8946 (10:48-10:66).

57

The Board's finding that the "interruptions" in Sullivan460 also equate to obstructions was supported by substantial evidence. Appx48 ("Petitioner explains, and we agree, that 'Sullivan460 detects the occurrence of 'two or more interruption cycles' (which are regularly spaced obstructions)'"), *see also* Appx203-04 (similar). For instance, Sullivan460 discloses that "[w]hen the flow rate measurement means 70 detects the interruptions to inspiratory flow10, the controller 100 activates a switch 110 which activates the nCPAP 15 apparatus 90 to supply air to the patient 30 at a pressure which ameliorates or eliminates the upper airway flow limitation for that patient." Appx8963 (10:12-17). Sullivan460 also teaches that "[w]hen airway vibrations are detected and determined to be representative of at least one interruption cycle, a signal is sent to the controller 100. The controller 100 then activates the switch 110, which switches on the nCPAP apparatus 90. The nCPAP apparatus 90 then supplies air to the patient at a pressure which ameliorates or eliminates the upper airway flow limitation for that patient." Appx8963 (10:22-25). NYU's argument that "small interruptions" "are not observed in snoring patients," fails to account for the disclosures above, which discuss the link between other interruptions and flow limitation. Br. 62-63.

Accordingly, the Board's finding that Sullivan995 and Sullivan460 disclose obstructions as claimed in the '009 and '115 Patents is supported by substantial evidence.

### 5. Substantial Evidence Supports the Board's Findings That the Asserted Combination Discloses Troubled Wakefulness

NYU again argues that Matthews can neither alone, *see* Br. 63-65, nor in combination with Sullivan460, *see* Br. 65, teach the "awake state of troubled wakefulness," primarily because NYU believes that (1) Matthews does not distinguish between "erratic breathing [that] spans both awake and asleep states," and (2) Sullivan460 cannot determine an awake state, *see* Br. 64-65. NYU's tired arguments remain unfounded. There was no error in the Board's analysis or conclusions, nor its rejection of NYU's arguments.

There is no dispute that "troubled wakefulness state" means that the patient is awake and the breathing pattern is irregular. *See, e.g.,* Appx15. And that is exactly what the asserted prior art combination teaches—that the patient does not have a reduced average airflow and therefore awake, and is experiencing erratic breathing. As discussed previously, a POSA would find that Sullivan460 discloses determining an awake state. *See supra* Section IV.C.3. The Board also found that Sullivan460 in view of Matthews teaches the troubled wakefulness state. *E.g.*, Appx64-66. The Board makes clear that the erratic breathing in the troubled wakefulness and REM sleep states as disclosed in Matthews can be differentiated using the disclosure of Sullivan460 to first determine whether the patient is awake or asleep. *See, e.g.*, Appx528. The Board properly discounted NYU's arguments to the contrary, premised on NYU's erroneous claim construction. *See, e.g.*, Appx212-13.

**6.     NYU's Challenge to Motivation to Combine and Reasonable Expectation of Success Repeats Its Flawed Arguments**

The Board correctly found motivation to combine Sullivan995, Sullivan460, and Matthews, and that a POSA would have a reasonable expectation of success in doing so. NYU argues to the contrary for many of the reasons discredited above, and concludes that the Board's rejection of its fallacious arguments was "error."

NYU once again argues no motivation to combine Sullivan995 with Sullivan460 because Sullivan460 "fails to effectively distinguish between awake and asleep states" and "lacks an enabling disclosure." Br. 65. ResMed has fully rebutted NYU's claims regarding Sullivan460 in its discussion above. *See supra*. Further, as the Board noted, motivation to combine Sullivan995 and Sullivan460 comes, in part, from Sullivan460 itself, which explicitly suggests modifying the CPAP device disclosed in Sullivan995. *See* Appx372 ("[T]he combination proposed by Petitioner presents the rare case where the combination is described explicitly in one of the references itself. In other words, at least part of the motivation to combine comes *directly* from Sullivan460. And, Sullivan460 *expressly incorporates Sullivan995 by reference*." (citing Appx8959 (6:22-25))). NYU never addresses this basis for motivation to combine.

NYU also argues that there was no motivation to combine the above references with Matthews "because distinguishing between troubled wakefulness and REM sleep necessitates the ***specific analysis*** advocated by NYU, which is not

addressed by Matthews." Br. 65 (emphasis added). NYU does not describe this "specific analysis," which is neither recited nor required by the Challenged Claims. *Id.* To the extent NYU refers to analyzing breathing patterns by evaluating the amplitude and temporal structure of breaths, the Board summarily rejected that analysis as being premised on a claim construction that the Board correctly refused to adopt.

NYU further argues that there would be no reasonable expectation of success in combining the references "because a POSA would not have anticipated that distinguishing between awake and asleep states required the sophisticated analysis involving digital signal processing techniques that extend beyond the mere aggregation of known prior art elements." *Id.* NYU argues that "digital signal processing techniques" are "required" to distinguish between awake and asleep states, and does so without further explanation. The Board, however, also rejected this argument stating that "[t]hese arguments are unavailing because they turn on Patent Owner's proposed claim construction, which we do not adopt." Appx68; *see also* Appx135-36, Appx208-09, Appx288, Appx386-87.

The Board's rejection of NYU's arguments represents its understanding that none of the "specific analytical techniques" that NYU claims are "critical to the functionality and efficacy of the technology in question" are recited in the Challenged Claims, and that they should not be imported therein. *See supra*. The

Board committed no error in finding a motivation to combine the references and a reasonable expectation of success, where NYU's arguments to the contrary were premised on its rejected claim construction. The Board properly repudiated both the claim construction and NYU's nonobviousness arguments based thereon.

### D. The Board Complied with the Administrative Procedure Act

NYU argues that the Board improperly "summarize[d] ResMed's and NYU's arguments" and "adopt[ed] ResMed's arguments based on its rejection of NYU's claim construction." Br. 68. But NYU ignores the Board's ample analysis beyond the summary of the parties' position, and fails to show a violation of the Administrative Procedure Act ("APA"). NYU's pro forma APA challenge should be rejected for the same reasons as above.

The Board only needs to address arguments in a way that fairly contemplates and resolves the arguments. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 124 (Fed. Cir. 2022). The Board must also "have an adequate 'evidentiary basis for its findings'" and "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *NuVasive*, 842 F.3d at 1382. The Board is "obligated 'to provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions.'" *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370 (Fed. Cir. 2020).

The Board adequately explained its rationale and identified the substantial evidence supporting its determinations.  Br. 68-69.  The Board analyzed the prior art references introduced by ResMed, explaining that those references teach the claim limitations and explained why NYU failed to identify any deficiencies in that combination.  *E.g.*, Appx16-32.  This finding is rooted in the facts established by the evidence in the record.  NYU's non-obviousness arguments were premised on its improper claim construction, which the Board fully analyzed and correctly rejected in favor of adopting ResMed's argument.  Br. 67-68.

NYU contends that in the Board's "wholesale adoption" of ResMed's argument evidence and "fail[ure] to address several critical issues raised by NYU, the Board failed to account for specific challenges posed by NYU." Br. 68. However, the Board adequately addressed NYU's enablement challenge, as the Board explained how the combination of prior art references teaches the claim limitations.  *See supra* Section C; Br. 67.  The Board fairly contemplated the arguments presented by both NYU and ResMed, weighing each party's respective arguments; the Board simply chose to adopt ResMed's arguments over NYU's based on a proper application of the law, which the Board thoroughly explained.

## V.    CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, the Court should affirm the Board's final

written decisions, and reject NYU's requested relief.[5]


Dated:  June 26, 2024                    Respectfully submitted,

                                         /s/ *Lisa K. Nguyen*
                                         Lisa K. Nguyen
                                         Eric E. Lancaster
                                         PAUL HASTINGS LLP
                                         1117 S. California Avenue
                                         Palo Alto, CA 94304
                                         Telephone: (650) 320-1800
                                         Facsimile: (650) 320-1900
                                         lisanguyen@paulhastings.com
                                         ericlancaster@paulhastings.com

                                         David M. Tennant
                                         Alan M. Billharz
                                         PAUL HASTINGS LLP
                                         2050 M Street NW
                                         Washington, D.C. 20036
                                         davidtennant@paulhastings.com
                                         alanbillharz@paulhastings.com
                                         Telephone: (202) 551-1822

                                         Grace I. Wang
                                         PAUL HASTINGS LLP
                                         200 Park Avenue
                                         New York, NY 10166
                                         Telephone: (213) 683-6211

---

[5]  To the extent the Court is inclined to adopt NYU's construction for the "analyzing the breathing patterns" terms, the Court should remand for the Board to address ResMed's alternative argument that the asserted prior art discloses temporal analysis.  Appx51; Appx130; Appx449; Appx523.

Facsimile: (213) 996-3211
gracewang@paulhastings.com

Kamilah Alexander
PAUL HASTINGS LLP
4655 Executive Dr., Suite 350
San Diego, CA 92121
kamilahalexander@paulhastings.com
Telephone: (858) 458-3000

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1433, -1434, -1437, -1438, -1439, -1440, -1442

**Short Case Caption:** New York University v. ResMed, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes __13,815__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/26/2024

Signature: /s/ Lisa K. Nguyen

Name: Lisa K. Nguyen